CARMA C. O'MALLEY, by next friend v. DAN EAGAN, ET AL.

(No. 1677; Sept. 21, 1931; 2 Pac. (2d) 1063)

For the appellant there was a brief by *Bedford* and *Cobb*, of Sheridan, Wyoming, and an oral argument by *Mr. William B. Cobb*.

236

For the respondent there was a brief by *Nichols & Stirrett* and *R. R. Rose,* of Casper, Wyoming, and oral argument by *Mr. Rose.*

BLUME, Justice.

Plaintiff was injured as a result of a collision on June 8, 1929, between a Buick automobile driven by the defendant Phillip S. Mahoney and a Chevrolet automobile driven by one Dan F. Eagan. Both Mahoney and Eagan were sued. The latter entered a special appearance on account of want of proper service of summons. A change of venue was taken from Natrona to Sheridan County, and the cause was tried against the defendant Mahoney alone, and he will hereafter be referred to as the defendant. The jury empanelled in the cause returned a verdict in favor of plaintiff in the sum of $7700. But the court entered a judgment notwithstanding the verdict, and from this judgment the plaintiff has appealed.

The collision happened about 11:30 at night. Plaintiff was riding as a guest with Dan Eagan and one Portman, coming from a dance and traveling toward Casper in a generally westerly direction. Defendant Mahoney, with two guests, was traveling from Casper, in a generally easterly direction, going to a dance. The accident happened about a mile and one-half easterly of Casper, close to a bridge, where there was a gulch, 18 feet deep. The road at that place was 24 feet wide, with pavement thereon $19\frac{1}{2}$ feet in width. At each side of the bridge was a wire fence, called a "wire mesh" in the testimony, extending 40 feet in length on the easterly and 40 feet in length on the westerly side of the bridge. The plaintiff testified to her injuries and what happened up to the time that she and Eagan and Portman left the dance hall, but claimed that she did not remember anything that took place from that time on until after the collision. The defendant testified that he was traveling at not to exceed 25 to 35 miles per hour, and there was no direct testimony contradicting this statement as to the speed at the time and immediately prior to the accident. Two witnesses, however, testified that about a mile west of the accident, the defendant passed them, going at the rate of 50 miles per hour or more, and that he kept in

front of them, while they themselves were going from 45 to 50 miles an hour. The plaintiff testified that Eagan had been driving carefully, having a new car; but as she did not remember anything that took place after she left the dance hall, her testimony as to the speed of Eagan's car at the time and immediately preceding the accident would be of no value. The only testimony on that point is that of defendant. He stated that he saw Eagan's car when about 300 feet distant, when he himself was about 150 feet west of the bridge and when Eagan was about 150 feet east of the bridge. The cars accordingly were traveling at about the same rate of speed. The only witness as to how the accident happened was the defendant, who was called by the plaintiff for cross-examination under the statute. He stated that he drove his car, his guests sitting on his right; that the lights of his car were on; that he noticed a car, subsequently found to be that of Eagan, coming toward him, about 300 feet distant, and traveling on the south, the wrong, side of the road, while he himself was also on the south side, his right side of the road; that he supposed that Eagan would turn to his own side in proper time; that he, Eagan had plenty of time and space to do so; that he himself ''continued in his course'' until within 50 feet from Eagan, when he realized that the latter would not turn out; that he thereupon applied his brakes and turned his car to the left immediately before the accident to try to avoid him. In nearly his own words, some of the testimony on the salient points was about as follows:

''I judge I was about half way in that west wire mesh, when I first decided that Eagan wasn't going to turn to his side of the highway, and Eagan was about equally distant in the other wire mesh, and the bridge is about 18 feet long. His car was coming straight on the south side of the road and my car was on that side of the road, my right side. As I threw my car over to the left to miss him, the right front of my car hit the right front part of his car, turned around like that (indicating) and my car kept in this direction, so when we both finished up that is about how we were (indi-

cating). I went about 10 to 15 feet I guess, but not as far as the fence (evidently that to the north). When I first noticed the Eagan car as behaving out of the right way I noticed that the car was about in this position I judge (indicating). Q. Why didn't you stop? A. I couldn't. I didn't turn to the right to avoid him, because I couldn't. There was a wire fence there, and a draw 18 feet deep. The fence is 2½ feet from the pavement. At the time I first saw the car, there was plenty of opportunity for Eagan to get to his own side of the road. I expected him to turn to his own side of the road. Just before the collision I turned my wheels over. I didn't expect a collision at the time, I thought I was going to miss him; I thought he was going to continue in a straight course. There was room in the road for him to turn back (to his right); but he never made any attempt to turn back. I ended up with my car facing east.''

The map on which the witness indicated places and distances was not introduced in evidence. As a result of the collision Portman was killed and the plaintiff was injured. The injuries to the other parties in the cars do not clearly appear. The testimony shows without contradiction that about a half hour after the accident, when Eagan was in the hospital, he was intoxicated, fought, cursed and swore at those about him, including his own stepfather, and that it took several nurses to control him. Plaintiff's mother, when recalled to the stand, testified to having smelled liquor on defendant's breath at the hospital, after the accident; but that testimony was contradicted by several witnesses. While contributory negligence of plaintiff is pleaded, none is claimed in the briefs, and we accordingly refrain from expressing any opinion thereon.

1. After the close of the testimony in the case, the defendant moved the court to direct the jury to return a verdict in his favor. This motion was denied. The jury returned a verdict in favor of plaintiff; thereupon a motion was filed by the defendant for judgment notwithstanding such verdict. This motion was sustained. Plaintiff contends that the court had no power to do so. We think, however,

that it was permissible under Section 5897, Wyo. C. S. 1920, which reads as follows:

"When, in the trial of a civil action, a motion is made by either party that a verdict be directed in favor of such party, or an instruction to that effect is requested, and the motion or instruction is denied, the trial court, on motion by such party for a new trial or for judgment notwithstanding the verdict, may order judgment to be entered in favor of the party who was entitled to have a verdict directed in his favor; and the Supreme Court, in reviewing the judgment on exceptions and error, may order and direct judgment to be entered in favor of the party who was entitled to have such verdict directed in his favor, whenever it shall appear from the pleadings and evidence that the party was entitled to have his motion or request for a directed verdict granted."

2. Error is assigned on account of Instruction No. 11, reading as follows:

"You are instructed that an automobile driver, who by the negligence of another, is suddenly confronted by and placed in an emergency and is compelled to act instantly to avoid a collision or injury, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice.

So, in this case, if you find by a preponderance of the evidence that defendant Mahoney was suddenly confronted with the Eagan car (which it is proven and admitted by the pleadings was traveling on the wrong side of the road immediately before and at the time of the collision) and that an emergency and a moment of immediate and imminent peril to himself and others existed, he is not guilty of negligence by turning to the left or wrong side of the road in an attempt to avoid the collision if that seemed, as an ordinarily prudent person, to him the wisest choice under all the circumstances."

It is claimed that the jury should have been told that the emergency must have existed without the fault of the defendant. That thought, however, is at least partially em-

bodied in the first part of the instruction, which states that "an automobile driver who, by the negligence of another, is suddenly confronted by and placed in an emergency." In any event, even if the instruction was not strictly accurate, the plaintiff was not prejudiced by the error, for the jury returned a verdict in her favor. Furthermore, the emergency in the case at bar was brought about, as will appear hereafter, solely by the negligence of Eagan, and the plaintiff was not, accordingly, entitled to any instruction upon the theory that the defendant might have been at fault.

3. The main question in this case is as to whether or not the liability of the defendant was for the jury, and whether the court, accordingly, erred in entering a judgment notwithstanding the fact that a verdict was found for the plaintiff. Before she can recover in this case, she is compelled to show not only that the defendant Mahoney was negligent, but also that such negligence was the proximate cause of the injury. 45 C. J. 1168. It is claimed herein that the defendant was negligent in driving his car at an unlawful speed, in not having it under proper control, in not driving it in such careful manner as to avoid the collision, and in not stopping. Sec. 3, Ch. 158, Sess. L. 1925, provides that no person shall operate a motor vehicle on any public highway at a speed greater than is reasonable; that he shall at all times have it under absolute control, and that a speed in excess of 35 miles per hour shall be *prima facie* evidence of failure to operate the vehicle at a speed that is reasonable and proper. We may, for the purpose of this case, admit that these provisions were violated, and that the defendant traveled in fact at the rate of forty or forty-five to fifty miles per hour, or more. But we should add here, that upon such assumption, in view of the fact that both cars involved herein arrived at the bridge about the same time, we must also assume that Eagan's car traveled at the same rate. Eagan's negligence, of course, could

not excuse the defendant's, in so far as liability to the plaintiff is concerned. Hester v. Coliseum Motor Company, 41 Wyo. 345, 285 Pac. 781. But such negligence has a definite bearing on the question as to whether or not the accident could have been avoided, if the defendant had not been negligent in his speed, or—which comes to practically the same thing herein—in not having his car under control.

Conceding, as mentioned, the defendant's negligence as above stated, it must be determined as to whether or not it was the proximate cause of the injury, or one of the proximate causes thereof. Ordinarily that question is for the jury, Hines v. Sweeney, 28 Wyo. 57, 45 C. J. 1168. That is true where different inferences may fairly be drawn even though the evidence is undisputed. But it is a question for the court where but one inference and conclusion can be drawn from the evidence; and whether only one inference may be drawn must necessarily ultimately rest with the court, for otherwise the jury would at all times have the right to arbitrarily determine the point. The proximate cause need not, of course, be shown by direct testimony; it may be determined from the circumstances in the case; but in view of the fact that the burden of proof rests upon the plaintiff, such circumstances must appear from the evidence. In the case at bar there is no direct testimony; if defendant's negligence was in fact the proximate cause of the injury, it must be gathered from the circumstances shown herein. Now, speed or any other alleged negligent act of the defendant cannot, of course, be said to have been the proximate cause, unless the accident could have been avoided in the absence thereof. And counsel for the plaintiff ought to be able to point out, by analyzing the circumstances shown by the evidence, how the defendant would have been able to have avoided the collision, had he been in the exercise of reasonable care. But counsel have wholly failed to do so, though they have repeatedly asserted that the jury might have rightly found that the defendant's negligence contributed to the injury in this case. So we

shall proceed, and ourselves, by an analysis of the facts, attempt to determine the truth. The presumption is that the action of the trial court was right. This presumption is strengthened in the case at bar by reason of the fact that the map used at the trial in connection with vital testimony was not introduced in evidence, and the trial court may, accordingly, have had a better view of the situation than we could have. And we must, in order to reverse its action, be able to point out how the collision might not, in the minds of reasonable men, have taken place, if the defendant had been in the exercise of care.

Let us first consider the question of speed in the abstract. We pointed out in Christensen v. McCann, 41 Wyo. 101, 109, 282 Pac. 1061, that excessive speed does not lead to liability, unless it was the proximate cause of the injury. And that is the universal rule. Blashfield, Enc. of Automobile Law, 2, 1221. In many, perhaps the majority of, accidents, unlawful speed is, or may reasonably be said to be, a contributing cause, but that is by no means true in all. The point has been discussed a number of times in connection with cases where one of the parties, as Eagan did in this case, traveled on the wrong side of the road. That was true in Stobie v. Sullivan, 118 Me. 483, 105 Atl. 714. The court said in part:

"The vital point of inquiry, however, is whether the collision took place on the north side of the road, which was Stobie's proper side as he was traveling westward from Hampden toward Waterville, or on the south side, which was Sullivan's proper side as he was going northerly toward Bangor. If each had been on his side, no trouble would have occurred, as the highway at that point was a state road, straight, wide, smooth, and well wrought. It was not the speed of either party that was the proximate cause of the accident, but the position of one car or the other on that side of the road where it did not belong. Bragdon v. Kellogg, 118 Me. 42, 105 Atl. 433, 6 A. L. R. 669."

In Whalen v. Dunbar, 44 R. I. 136, 115 Atl. 718, 720, it appears that plaintiff was a passenger in a car of Brown proceeding northward on the road, following another automobile. The latter suddenly slackened its speed, and Brown's car, in which plaintiff was riding, in order to avoid a rear-end collision, suddenly turned to the left, and in doing so collided with defendant's car which was traveling south on the same road, and on the right side thereof. Defendant was sought to be held liable on account of the excessive rate of speed in which he came, some testimony indicating that he traveled at the rate of 55 to 60 miles an hour. The jury found in favor of the plaintiff. But the appellate court, in holding that the court should have directed a verdict, said in part:

''All of the testimony of any probative value relative to this question is to the effect, and the physical facts demonstrative that the collision occurred while Brown's automobile was proceeding diagonally across the road and when the front of his automobile must have been near the westerly side of the macadam surface (of the road), and that the collision occurred almost immediately after Brown turned to the left. There was no danger whatever, regardless of the speed of the defendant's automobile, until Brown suddenly drove his automobile at such close proximity to it that the collision was inevitable. If it should be conceded that the defendant's automobile at the time the emergency was created was proceeding at a rate of speed in excess of the statutory limit, there was no testimony of probative value showing or tending to show that the accident would not have happened if the defendant's automobile had been proceeding at the rate of 25 miles per hour, or even at a much less rate of speed, or that the speed of the defendant's automobile in any way entered into the cause of the collision. As the defendant's automobile in no wise contributed to the accident, the rate of speed is immaterial, and liability cannot be predicated upon the speed of said automobile. Burlie v. Stephens, 113 Wash. 182, 193 Pac. 684; Cross v. Rosencranz, 108 Kans. 350, 195 Pac. 857.''

246

In Burlie v. Stephens, 113 Wash. 182, 193 Pac. 684, 686, while unlike in many of its facts to the case at bar, illustrates this principle, where the court said in part:

"But if it should be conceded that at the time of the collision the automobile was traveling at the rate of 20 miles an hour, and that such speed was in violation of the state laws and city ordinances, yet there is not a word of testimony showing, or tending to show, that the speed of the car had anything to do with the collision. The record shows that the collision would have occurred, whether the automobile was traveling at the rate of 10 miles or of 30 miles an hour. There was no danger at all, regardless of the speed of the car, until the boy suddenly turned in front of it at such close proximity to it as that the collision was inevitable. The violation of a speed ordinance or statute is not, in itself, sufficient to make the driver of the automobile liable in damages in the event of a collision. There must be something more; it must appear that such violation was the proximate cause of the injury. There is absolutely nothing in this case to show that the speed of the car was the proximate cause of the injury. We feel confident, therefore, that the court was correct in taking away from the jury the question of the speed of the automobile."

Cross v. Rosencranz, 108 Kans. 350, 195 Pac. 857, 859, while not involving travel on the wrong side of the road, is illustrative of the point under discussion. There a boy riding a bicycle was injured by an automobile at a crossing. As in the case at bar, he had approached the place of the accident at an unlawful speed. The court said in part:

"If he had been crossing 14th street at the statutory rate of speed, with his motorcycle under control, stopping would not have averted the collision, turning into 14th street (to the right) would not have saved him, and there is no suggestion that any other way of escape being running down was open. It is true the plaintiff violated the law by crossing fourteenth street at an excessive rate of speed which brought him practically to the place of collision. The defendants assert that the accident occurred in fourteenth street, and for the purpose of a decision the fact may be admitted. Nevertheless, it is quite elementary that viola-

tion of a speed regulation does not constitute actionable negligence, defeating recovery unless it contribute to injury.''

Speed, considered by itself, cannot, accordingly, be said to have necessarily contributed to the accident in question. That is clear when we bear in mind that if the defendant had traveled at a lawful rate of speed, but had started a few minutes earlier, he would have been at the place of accident just the same. The speed, therefore, considered by itself, may have been merely a condition of the accident, and remote in the chain of causation, from which no liability arose. Lemos v. Madden, 28 Wyo. 1, 17, 200 Pac. 791. Something more must appear in order that it may be said to have contributed to the accident, as, for instance, the duty to stop, the inability to do so by reason of the excessive speed, and that, had defendant stopped, the accident could have been avoided. It is, in fact, argued by counsel for the plaintiff that these factors were present in the case at bar, and in that connection it is further argued that it was for the jury to say as to whether or not the defendant should have sooner observed that the Eagan car would not turn out to its right side. Now attention need hardly be called to the law of the road, as universally observed in the United States, and as expressed in Sec. 4, c. 158, Sess. L. of 1925, that ''whenever any person, traveling with any vehicle or conveyance on any road or public highway in this state, shall meet another vehicle or conveyance, traveling in an opposite direction, it shall be the duty of the driver of such vehicle or conveyance to turn promptly to the right of the center of the traveled road until such vehicle or conveyance has passed.'' It is said in Berry, on Automobiles, (5th Ed.) Sec. 252, that

''One who violates the law of the road by driving on the wrong side assumes the risk of such experiment and is required to use greater care than if he had kept on the right side of the road. If a collision takes place under such cir-

cumstances, the presumption is against the party who was on the wrong side."

And in Blashfield, Ency. of Automobile Law 1, p. 416, the author says:

"A motorist has a right to presume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such an assumption in determining his own manner of using the road; and a driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left side, will yield half the way, or will turn out in time to avoid a collision, and not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road, on which he is lawfully driving, until he sees or ought to see, that such assumption is unwarranted."

According to this authority, therefore, the time may come when a person traveling on the right side of the road ought to observe that the person coming from an opposite direction will not obey the law. Nevertheless, as was said in Shaw v. Wilcox, (Mo. App.) 224 S. W. 58, 59, "a condition of discoverable peril must have existed." The rule is stated in Huddy, Ency. of Automobile Law (9th Ed.) Vol. 304, Sec. 116, thus: A driver on the right side of the road has a right to assume that a vehicle approaching on the wrong side will turn to the proper side in time to avoid a collision, unless it is obvious that the driver of the latter vehicle does not intend to turn, or is unconscious of the danger which is imminent."

In Albright v. Joplin Oil Co., 206 Mo. App. 412, 229 S. W. 829, 830, the court said:

"We are of the opinion that the driver of the truck had a perfect right to continue down the street, the deceased showing no evidence of being oblivious to the danger of remaining on the wrong side, and that he had every reason to believe that as they were both approaching each other, they could see each other, and that he would further have

a right to rely on the fact that the deceased, being on the wrong side of the street and seeing the truck approach, would use reasonable exertions to turn out of the way and exercise that degree of care for himself which any ordinary prudent person is expected to use. The fact, therefore, of itself that the deceased was in the street, on the wrong side thereof, when there was no appearance of his being oblivious to the oncoming truck, would not place a duty on the driver of the truck to slacken his speed or change his course so long as he was on the right side of the street where he belonged and within the law and the traffic rules, until he reached a place where it was apparent to the driver of the automobile that the deceased was unconscious of his oncoming danger, or although duly alive to the danger, he was unable to get to a place of safety.''

And in Cook v. Standard Oil Co., 15 Ala. App. 448, 73 So. 763, 764, the court said on the point here discussed:

''The plaintiff had a right to assume that the driver of the wagon would rein his team to the right-hand side of the road, so as to permit the plaintiff's vehicle to pass, until it became obvious that the driver was making no effort to do so or the danger of a collision was imminent.''

In the case at bar Eagan was traveling on the wrong side of the road. It was night. Defendant had his lights burning. Eagan must have seen him coming, unless he was out of his senses, which he probably was. But defendant did not and could not know it. So far as the record shows, there was nothing whatever which would indicate to defendant that Eagan would not obey the law; nothing that was calculated to overcome the presumption mentioned. To hold that under these circumstances the jury had a right to say that defendant should have known sooner than he did that Eagan would not turn out would be contrary to the general rule that the jury's decision must be based upon evidence, and would leave them an arbitrary discretion which is nowhere warranted in the law. To give them such power would, we fear, so unsettle the ''law of the road,'' as to lead to dangerous consequences, and bewilder all travelers

in automobiles in knowing when or when not to rely on the fact that the person coming from the opposite direction will obey the law. We think, accordingly, that defendant cannot be held to have been negligent in not sooner determining that Eagan would not turn out. That was, when he was about 50 to 58 feet distant, or, as stated by him in another place, just an instant before the collision. The same reasoning applies to defendant's duty to stop. He could not be held to have been negligent until he saw or could have seen that Eagan would not obey the law. That, we think, is clear. Some of the cases go even farther than that. In Shaw v. Wilcox, supra, the defendant was on the wrong side of the road. The collision occurred, when the plaintiff, thinking that the defendant would not turn to his proper side, suddenly veered to the left, and the defendant at the same time turning to his right. The court said among other things:

"Plaintiff was on the proper side of the street, and while he could not blindly and heedlessly drive into a car, even if properly using that side of the street, yet he had a right to expect, and to act on the theory, that defendant would turn to the right, and go to his proper side in passing. * * * As we have stated, plaintiff was on the proper side of the street, and had a right to expect defendant to turn to his right and clear plaintiff's way. The duty of the plaintiff to stop or take such other precaution only arose when by due care plaintiff discovered that defendant could not or would not himself turn to the right and clear plaintiff's way. A condition of discoverable peril must have existed. Indeed we doubt, if a duty to stop on plaintiff's part ever arose in this case, as such duty only arises when it becomes apparent to plaintiff that he might not be able to avoid a collision by himself turning his car to the left and going around the defendant."

The accident in the case of Goodson v. Produce Co., 10 Ala. App. 486, 120 So. 689, 691, happened in a similar manner, and the court said:

"In the case at bar, defendant's truck was on the wrong side. On meeting plaintiff's car, the driver failed to turn in time to avert the collision, and no reason has been or can be suggested why he should not have done so. He was, therefore, negligent, and that negligence was the efficient, prime cause of the collision and resulting injury. * * * It may be argued that plaintiff, having seen the truck at some distance approaching on the wrong side of the road, could and should have turned before he did, and thereby averted the collision, or that he should have stopped his automobile on his side of the road. But, as already stated, the appearances were such as to cause a reasonably prudent man to believe that if he stopped the truck would run over him. As to whether he should have turned to the left sooner than he did, it must be said that he had a right to assume that the driver would observe the law and turn to his side of the road."

The accident in the case of Kennedy v. Opdenweyer, 11 La. App. 532, 121 So. 636, 639, 123 So. 906, also happened in a similar manner, the plaintiff's car, in that case, being on the wrong side of the road. The court, holding that defendant was not in any way to blame, reversed the verdict of the jury and entered one for the defendant, saying in part:

"From the foregoing testimony, facts, and circumstances, it is therefore clear that defendant was forced by Kennedy, who was driving on the wrong side of the highway, to suddenly veer his sedan to his left and to dash across the road to avoid a head-on collision * * *. The law of the road requires each to drive on his right side. Laymen all know this rule, and cannot plead ignorance of it. Defendant had therefore the right to rely on that rule in this case and to expect that Kennedy would have turned to his side of the road, and was not in duty bound to stop his car. The gross negligence was on the part of Kennedy and not on defendant who was forced by the fault of the former to veer his course to the left as before explained. * * * The facts here show conclusively that, if the collision occurred on Kennedy's side of the road, defendant was forced there to avoid a head-on collision by the gross negligence of Kennedy, and that the conduct of defendant was entirely justi-

fiable and excusable under the circumstances. * * * Likewise it can be said here that the swerving by defendant was brought about by Kennedy, plaintiff's deceased husband. The defendant here was confronted with an emergency, was suddenly placed in a perilous situation, and, to avoid the impending danger, with little time to think or reflect, dashed across the road, and in which it must be held that he pursued the proper course and exercised ordinary care under the circumstances. See, also, Smith v. Interurban Transp. Co., 5 La. App. 704. Plaintiff invokes also the rule of the last clear chance, which it is contended defendant failed to observe. This rule has no application in this case, but, if it can possibly be applied, it can be said that, when defendant veered to his left, he offered Kennedy the opportunity to pass him on the south side of the road, and thus take advantage of the last clear chance to escape the impact.''

In the case of Bazile v. Landry & Co., 10 La. App. 747, 122 So. 901, there was apparently a head-on collision, the defendant being on the wrong side of the road. The court said:

''It is argued, however, that the Ford truck was also to blame because, according to the evidence, the Dodge car was seen by the driver of the Ford truck at a time when the cars were sufficiently far apart to permit him to avoid the accident. In other words, defendant invokes the doctrine of the last clear chance. We are of the opinion that the doctrine is improperly invoked in this case. The fact that the driver of the Ford truck saw the Dodge car at about 100 feet, as is testified to, or at a greater distance, did not afford him an opportunity to avoid the accident. If it be suggested that he should have driven over to the left side of the road, in order to escape the Dodge car, the answer is that such maneuver would have been calculated to increase the danger of collision, since it must be assumed that the driver of the Dodge car would have sooner or later, and in time to avoid the collision, taken his position on the proper side of the road. The driver of the Ford truck in seeing the Dodge car directly in his path, was justified in believing that he would pull over to his right in time to avoid the accident. The Ford driver could not drive further to the right, without getting off the roadway and if he

stopped his car, and the Dodge had maintained its position, as it did, the accident would have occurred just the same.''

4. As already indicated, the defendant could not, after he knew that Eagan would not turn out, recklessly run into the latter's car. In fact the instinct of self-preservation would be sufficiently strong that he would attempt to do something to save himself and the two passengers with him, if there was any way to do so. There were certain alternatives: stop, turn to the right, or turn to the left. There were no others. We shall consider these alternatives and analyze whether by taking either of them, the defendant could have avoided the accident, if he had been in the exercise of reasonable care; if he could not, then his negligence, if any, could not be considered the proximate cause or one of the proximate causes of the accident.

(a) As to stopping. Counsel for the plaintiff contends that ''if Mahoney had been traveling at a lawful rate of speed of thirty-five miles per hour, fifty feet was ample distance within which to bring his car under absolute control'' and that he could thus have avoided the accident. But, unfortunately, counsel overlooks other facts. There is no evidence in the record in how many feet the defendant, traveling at thirty-five miles per hour, could have stopped his car. But assuming that he could have brought it to a stop, as counsel contend, that would not have aided the situation, for counsel wholly ignores the fact that Eagan was traveling toward the defendant. There is no testimony whatever that Eagan made the slightest attempt to stop his car or to reduce his speed. On the contrary, the testimony of his drunken condition would seem to indicate that he made no such attempt, and that he continued in his course without change. So that, even if Eagan could have stopped instantly—and there is no intention that he should have been able to have done that—there would have been no possible way to have avoided the collision. It would have happened in much less than a second's time, if defendant

had stopped entirely, and in even less time than that if he had traveled at what would be considered a reasonable rate of speed. A head-on collision would have been inevitable, if the defendant had remained on the right side of the road where he was. There is no evidence that this collision would have been less severe than the collision which actually resulted. With Eagan traveling at 40 to 50 miles per hour, it doubtless would have been worse. It follows, accordingly, that the speed with which defendant was traveling or the failure to reduce or control such speed, or to stop, can not be said to have been a contributing cause of the accident in question.

(b) As to turning to the right. Counsel for the plaintiff does not seem to contend, or at least seriously, that the accident should have been avoided by the defendant turning to the right. Still we shall examine that phase of the case. The evidence is not very specific as to the exact place on the south side of the road where Eagan and defendant were driving. The impression left by the record is that they were both traveling on the outer edge of the paved road, on the south. The defendant testified that he could not turn to the right on account of the fence, 2½ feet from the paved way, and on account of the gulch 18 feet deep, just 20 feet ahead of him when he observed that Eagan would not turn out. This testimony is not contradicted. The map used in the trial of the case is not before us, and the trial court had, perhaps, a better view of the situation than we could have. Two and one half feet is, of course, but a short distance, and it would, doubtless, be somewhat difficult for the defendant, sitting as he was on the left side of his car, to tell just exactly how far he was from the fence. Still, had he been close up to the fence, the accident could not have been avoided, when Eagan continued straight in his course, as he seemed to have done. The width of Eagan's car was, say, five feet, and while in that event there would not have been a straight head-on collision, it would have been partial, and it would seem, at least as severe as the collision which ac-

tually resulted. We are unable to see how it could be said that the jury had a right to find that defendant should have gone through the fence, particularly since the strength of this fence or the situation of the ground beyond the fence is not shown by the testimony. Surely the defendant could not have been expected to run into the gulch 18 feet deep, especially in view of the fact that he had two guests in his car. Ford etc. v. Shaw, 8 La. App. 751.

(c) The only alternative, then, which the defendant had under the circumstances, to avoid collision, was by turning to the left. The only mistake, which, so far as we can see, the defendant may have made, was to apply his brakes; had he not done so, he might have escaped contact with Eagan's car entirely. But that action was probably practically involuntary; no charge of negligence is based thereon, or is claimed; nor could we find any under the circumstances in this case, for the defendant was acting under an emergency. The rule that a party will not be excused, though acting under an emergency, unless he is free from blame, cannot be applicable here, for in view of the fact that the speed with which the defendant traveled was not the proximate cause of the accident, the emergency must be held to have been brought on wholly by the negligence of Eagan. See Bloom v. Bailey, 292 Pa. 348, 141 Atl. 150, 57 A. L. R. 585. Counsel for the plaintiff seems to argue that the mere fact that the defendant turned to the left shows him to have been negligent, because he thereby violated the law of the road; that the fact that Eagan also did, will not excuse him from liability toward plaintiff, and that his negligence necessarily contributed to the accident, or the question was at least one for the jury. There are many cases where a person suddenly turning to the left, because forced to do so on account of another coming toward him on the wrong side of the road, has been held not to have been negligent. Skeene v. Graham, 114 Me. 229, 234, 95 A. 950; Kennedy v. Opdenweyer, supra; Whalen v. Dunbar, supra; Goodson v. Produce Co., supra. In Walker v. Lee, 115 S. C. 495, 106

S. E. 682, it was held that a situation may arise where a traveler must turn to the left and technically violate the law. We need not determine that point. In most of the cases on the subject—see note 24 A. L. R. 1308—it is said that it was for the jury to determine whether a man was negligent in turning to the left. In some of these, it was not necessary to determine the point before us. In others, the accident might have been avoided, in the minds of reasonable men, if the party charged had done something else, which it was in his power to do. But it would seem to be clear, that when the accident would, as in the case at bar, have happened in any event, even though the defendant had done something else—if he had turned to the right or had stopped—negligence in turning to the left is wholly out of the question as a matter of law (Kennedy v. Opdenweyer, supra), unless, possibly,—a point which we do not decide— by turning to the left, the accident was in fact more severe than it would have been otherwise, and of this there is no evidence. It was, probably, not as severe as it would have been if the defendant had stopped or turned further toward the fence. The right side of the defendant's automobile struck the right side of Eagan's, and if the former had been but a few feet further along, no serious accident would probably have taken place.

We have not, accordingly, any more than counsel for plaintiff, been able to discover any method by which the defendant, had been in the exercise of reasonable care, could have avoided the accident. At least, no method is pointed out by the evidence, and the negligence of the defendant, if any, cannot, therefore, be said to have been one of the contributing—the proximate—causes of the accident. The doctrine of the last clear chance can have no application here. When the defendant discovered the peril in which he, his fellow passengers and the occupants of the Chevrolet car were in, but a moment's time intervened until the collision occurred. The defendant thought that there

were two or three seconds. He was wrong; there was not nearly that time; less than a second intervened. The doctrine mentioned can never apply where the party charged is required to act instantaneously, and if the injury cannot be avoided by the application of all means at hand after the discovery of the peril, or as some would hold, after the peril should have been discovered, at least in cases in which, as in the case at bar, any previous negligence of the party charged cannot be said to have contributed to the injury. Burlie v. Stephens, supra; Southern Express Co. v. Roseman, 206 Ala. 681, 91 So. 612; Bazlie v. J. F. Landry & Co., supra; Kennedy v. Opdenweyer, supra; see 45 C. J. 880, 993. That is clearly the situation here. We cannot, of course, help but sympathize with the plaintiff, who, through no fault of hers, has been injured. But the blame, according to the evidence in this case, rests with the driver of the car in which she rode. We think the court was right in entering judgment notwithstanding the verdict of the jury, and we see no alternative but to affirm it. An order to that effect will be entered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.